CHARLES MORTENSEN, Appellant, v. FREDERICKSON BROTHERS, Appellees.

SALES: Rescission—When Status Quo Impossible. A mutual rescission
1 of a contract of sale, made after delivery to the buyer and after the buyer had expended large sums in the keep of the cattle, does not, in the absence of some agreement as to reimbursement, ·presumptively carry an obligation on the part of the original seller to reimburse the buyer for the keep of said cattle.

SALES: Rescission—Evidence. Evidence relative to a transaction
2 wherein the vendee of cattle permitted the cattle to be shipped and sold in the name of the vendor reviewed, and held insufficient to constitute a rescission, let alone an agreement to reimburse the vendee for losses in keeping the cattle.

INTEREST: Nonallowable Interest. A party is not entitled to inter-
3 est on a payment made strictly at the time provided by his contract.

*Appeal from Shelby District Court.*—EARL PETERS, Judge.

DECEMBER 15, 1922.

ACTION at law, to recover the costs and expense of feeding certain cattle originally purchased by the plaintiff from the defendants and afterwards retaken by the defendants. There was a verdict and judgment for the defendants, and plaintiff appeals.—*Affirmed.*

*Robertson & Robertson* and *Edward S. White,* for appellant.

*Preston & Dillinger* and *T. H. Smith,* for appellees.

EVANS, J.—I. The case was before us upon a demurrer to the petition in *Mortensen v. Frederickson Bros.,* 190 Iowa 832. The pleadings were voluminous, and were set forth in the cited

1. SALES: rescission: when *status quo* impossible.

opinion, and we shall not again set them forth. On the 18th of May, ·1919, Mortensen bought from the defendants 191 head of fat steers, at $14.75 per one hundred weight. Under the agreement, delivery

was to be made by the defendants within ten days. $2,250 was paid upon the purchase price. At the expiration of ten days, a few days' extension was permitted, because of adverse market conditions. On June 2d or 3d, the cattle were weighed out to the plaintiff, and the purchase price thereby fixed at $32,050 plus. At that time, the cattle were ripe for the market; but the market was bad, and plaintiff requested the privilege of keeping and feeding the cattle upon the defendants' premises until market conditions should improve. He so held and fed the cattle until July 27, 1919. On that date, he proceeded to ship them. They were driven to the railroad station on Sunday night, by the joint action of himself and defendants. He had made no payment of the purchase price except the initial payment. The purchase was a cash purchase, and the purchase money had been due since the date of the weighing. The defendants and their banker, Simonsen, were unwilling to permit shipment without payment of the purchase price. The plaintiff being unable to pay, the cattle were shipped in the cars ordered by the plaintiff, but in the name of Frederickson Brothers. They brought on the Omaha market approximately $32,300. The defendants charged against this amount the balance due them on the purchase price, and allowed to the plaintiff full credit for the initial payment that was made. The plaintiff in his petition declared upon an alleged mutual rescission of his contract of purchase of the cattle, whereby the parties were to be restored to their original *status quo.*

During the eight weeks while he was waiting for improved market conditions, the grain fed by him to the cattle amounted in value to approximately $7,000. It is this cost which he sues to recover, on the theory that he was entitled to be put in the position in which he was immediately before he made the purchase. To put it in another way, the enterprise of purchase had proved a losing one. The cattle were actually shipped at the time which the plaintiff had selected, in the cars which he had ordered, to the commission house which he had selected, and were sold under the same market conditions which would have obtained if the plaintiff himself had made the shipment. The net result was a loss to him of approximately $7,000, and the net effect of his claim in this action is that the alleged mutual

rescission of the purchase of sale transferred that loss from himself to the defendants. At the close of plaintiff's evidence, the trial court ruled that the plaintiff was not entitled to recover such costs of feeding, and that this was so, regardless of whether there was a mutual rescission or not. For this reason, the court refused to submit to the jury the question whether there was in fact a mutual rescission, and refused to rule whether the evidence in support of such claim was sufficient to go to the jury. The parties thereupon stipulated certain facts into the record, and the court directed a verdict for the defendants. The principal assignment of error presented by the appellant herein is that the court erred in holding that the plaintiff was not entitled to recover such feeding costs.

The major premise of argument for appellant is that his evidence was sufficient to sustain a finding by the jury that a mutual rescission was agreed upon between the parties, and that, because such rescission was *mutual,* the legal effect thereof would restore the *status quo* of the parties as it was before the purchase of the cattle was made. The second premise is that it was essential to the restoration of the *status quo* that the plaintiff's loss, as represented by the feeding costs, should be charged to and assumed by the defendants. In the light of the record, the contention is somewhat heroic. The distinctive feature of a mutual rescission is that it is one made by mutual agreement between the parties, regardless of the right of either party to enforce or to resist a rescission. This is only saying that it is competent for parties to a contract to enter into a new contract, and that the terms of such new contract will be binding upon them. If the parties hereto mutually agreed in terms that the defendants should repurchase or take back the cattle, and that they should return to the plaintiff the purchase price and should further pay all his feeding costs and thereby hold him harmless against loss, if any, then the plaintiff would be entitled to recover, as prayed herein. But if reliance be had, not upon the expressed terms of an agreement, but upon the implication arising out of acts and conduct and a few words and silence, then the inference which the court will draw and imply will follow the existing equities between the parties, in so far as it can be done consistently with the conduct of the parties. The first

count of plaintiff's petition is predicated upon the first hypothesis; the second count is predicated upon the latter. It is not required that the express terms of a mutual rescission shall restore the *status quo*. It is competent for the parties to agree upon a qualified or partial restoration. And this is especially so where the nature of the case is such that it is impossible to restore exactly the original *status quo* of both parties. Such was the case here, by reason of the market conditions, if not also of the deteriorated condition of the cattle. A large loss had already accrued to the plaintiff. He could not be put *in statu quo*, even by a resale of the cattle to the defendants at the original price. If the feeding loss were to be regarded as following the cattle, and thereby transferred to the defendants, then the defendants could not be put *in statu quo*. The record discloses no special agreement as to the terms of the alleged

2. SALES: rescission: evidence. rescission, nor does it disclose an express agreement that there should be a rescission, mutual or otherwise. The first count of the petition, therefore, may be disregarded.

Can an agreement of rescission be implied from the acts and conduct of the parties and from what little was said by them? And can an agreement be implied therefrom that the defendants were to pay the feeding costs incurred by the plaintiff in the care of the cattle?

The record discloses that the defendants and their banker, one Simonsen, were insistent that payment should be made for the cattle before they should be delivered to the railroad company for shipment. The plaintiff proposed to give them a check, though he had no money on deposit to meet it, and also proposed to give them a sight draft on his commission man at Omaha, to whom he proposed to ship the cattle. These offers were not satisfactory to the defendants. The plaintiff called up his own banker in his home town, but was unable to make satisfactory arrangements with him. Plaintiff testified as follows:

"A. Mr. Hardy Frederickson and the same gentleman came up right to me on the corner there, and said: 'Charlie, we will not do that; we either want the money or we are going to take them cattle back.' Q. Did they say anything more? A. I said, 'Mr. Frederickson, I will not talk to you before I get

them cattle in the stockyards.' * * *    Q. Any further talk
there? A. He kept on telling me he wanted to take them right
back, before they got in the stockyards. Q. Was that right
then before they got to the stockyards? A. Yes, sir. Q. And
you told them they could not do that? A. I told them they
could not do that. Mr. Frederickson came up then and said:
'We are either going to take them cattle back or you got to pay
for them right now. We will show you what we can do. We
have seen a lawyer, and know what we can do.' I told them
that: 'If you seen a lawyer, you seen the wrong one. You
better go back and see another one.' I said: 'When I get them
cattle to the stockyards, I will talk to you.' Q. What did they
say in reply to that? A. He objected; he wanted to take them
right there. I didn't say any more. I kept on driving them in,
and got them in, and—and—got them in. I finally got them in
the Rock Island stockyards there. Frederickson and this other
gentleman were right there. Q. What happened then, as soon
as you got them in and got the gate shut? A. I told them then,
'I am going to call up my bank at home at Underwood, and see
what I can do with him,' and I got hold of Louis Shields of
the Savings Bank on the telephone, and I told him what I was
up against,—bought these cattle, the boys want their money, 10
o'clock at night, and haven't got it; and he said to me, 'Charlie,
I cannot help you out with that amount of money down there
at that time of night.' Q. And on Sunday night? A. Yes,
sir. Q. All right? A. And then I went outside, and I said
to Mr. Frederickson, Hardy and Malling: 'You can take them
cattle back; *but remember, I am going to make you pay for it.*'
Q. 'You can take them cattle back; but remember, I will make
you pay for them?' A. Yes, sir. Q. What did they say? A.
Didn't say anything. Hardy Frederickson and Malling Fred-
erickson ask me if I would turn over them nine stock cars to
them, and I said, 'Yes;' and we went to the Rock Island agent's
house, in order to get the agent to go down and change those
bills of lading. I had previously ordered these nine cars at
Underwood, and had the bills of lading made out, but I hadn't
signed them. That time, I had provided for shipment of these
cattle to the Tom Lindley Commission Company, in Omaha.
We changed the bills of lading then, and the name of Frederick-

son Bros. was put in place of my name. Malling Frederickson and Hardy and me and the agent and Malling Frederickson's hired man were present when this was done. Hardy Frederickson and Malling Frederickson said for me to go down and help them load. Q. What did you say? A. I said, 'No, sir; I haven't got any cattle here.' I went down and, helped them load them, and we got through about 12 o'clock, and I went home to Underwood. The firm of Frederickson Bros. or Malling Frederickson or Hardy Frederickson have never seen me with reference to making any accounting for these cattle that they took; they have never sent me any statement of what the cattle came to after they sold them; they have never offered at any time to meet me at any time or place and have an accounting with reference to the sale of these cattle, or what they brought.''

He also testified on cross-examination as follows:

''I told the boys that I would give them a check for what I owed them. I knew it was around $30,000 or $31,000 or $32,000. We did not figure up everything on this Sunday that I drove the cattle to Avoca. We just talked over the little matters. Just before I took the cattle out on Sunday afternoon, we hadn't made any settlement on the cattle at all, and I told Malling Frederickson we ought to make a settlement; that I could give him my personal check, and, 'You can hold them cattle until I get to Omaha. After the cattle are sold, you can produce this check of mine, and the Omaha commission man will give you a check in place of it, and then it would be all settled;' but we hadn't settled anything on the cattle yet. I didn't know how much my check would be. * * * They went back to town, and I drove the cattle to the stockyards, where I next saw Simonsen and Hardy, and I told Simonsen that I wanted to talk to my banker over the telephone. I went to the hotel on top of the hill, and telephoned from there. Mr. Simonsen went with me to the hotel. Simonsen first called Shields up, and talked with him; then I took the telephone and talked to my banker, and he told us he could not pay such a big check; then I suggested to Simonsen that they take a sight draft on my commission men; but he told me that they would not do that. That was before I talked on the telephone with Shields. He said he wouldn't be willing to take a sight draft. * * * Simonsen was

there at the time. Hardy Frederickson and Malling Frederickson were about 50 or 75 feet from the hotel building where I was telephoning. After I had telephoned, I told the Frederickson boys the banker had turned me down. The bill of lading was then changed, and Frederickson's name put in place of mine. I didn't see the bill of lading. I told the agent to turn the 9 cars over to Hardy Frederickson and Malling Frederickson. Malling and Hardy and Simonsen and I went to the agent's house about 10 o'clock that night, and had a talk with him about what I ought to do. I did not go down to the freight house with Brown, the agent, and into his office there. He made the changes in his office. I did not go into the office. I stayed right outside the door. I think these papers were fixed up. No, I did not know that they were going to send the cattle to the Lindley Commission Company. They told me they couldn't let me take the cattle out of their possession unless I paid for them. Q. They told you they would not let the cattle out of their possession unless you did pay for them, didn't they? A. Yes, sir. I told them that, if they took those cattle, *they would have to pay for them.* I helped load the cattle."

On redirect examination, he testified:

"Q. You said they did tell you they could not let the cattle out of their possession and have them taken to Omaha unless the purchase price was paid,—did they say anything to you about their possession of the cattle? A. Mr. Hardy Frederickson did. Q. What did he say about it? A. He said, 'Charlie,'—he came and introduced this man to me, and then Mr. Hardy said: 'Charlie, we must have the money out of these cattle, or we will have to take them back tonight.' "

The foregoing presents the substantial part of the evidence upon which the plaintiff relies as an implied contract of mutual rescission. It will be noted that the situation presented was that the plaintiff's failure to pay for the cattle was a breach of his contract. The defendants were asserting a right to insist upon payment as a condition of releasing the cattle for shipment. The defendants permitted the shipment to be made, provided that it be made in their name, so that returns of the proceeds should be made to them. Pursuant to this arrangement, both plaintiff and defendants joined in loading the cattle, pur-

suant to the plaintiff's original plans, and in the same cars which the plaintiff had ordered, and shipped the same to the plaintiff's commission house. The plaintiff followed the cattle to Omaha. The defendants had never denied the right of the plaintiff to an accounting for the proceeds of the sale. This suit was promptly brought, and a complete accounting was made by the pleadings and at the trial. After a full accounting, the court found a balance due the defendants of $2.95, and entered judgment accordingly against the plaintiff. It will be noted from the plaintiff's testimony that, in his final yielding to the demands of the defendants, it was done with the declaration, "I will make you pay for them." The natural implication from this statement would be that he charged them with conversion of the cattle. Assuming that their action amounted to a conversion, this would not render them liable for the prior feeding costs of the cattle. There was an appropriate measure of his damages for a conversion, and he has had the full benefit of it in the accounting. As between these parties, it was equitable and right for the defendants to insist that the bill of lading be made in their name, as a condition to their relinquishing their asserted right, and releasing the cattle for shipment in advance of payment. The record does not disclose why any other or different implication should arise out of the conversation and conduct set forth in the testimony of plaintiff. Neither the language nor the conduct of defendants indicates any purpose to rescind on their part; much less would it indicate any purpose on their part to assume the feeding costs of the cattle while they were withheld from the market by plaintiff. Neither does the evidence disclose any understanding on the part of the plaintiff that a rescission was being agreed upon between him and the defendants. On the contrary, his evidence negatives such an implication.

We hold, therefore, that the evidence warranted no recovery by the plaintiff upon either count of his petition, and that the trial court properly directed the verdict thereon.

II. The plaintiff assigns error because of the failure of the court to allow him interest upon his advance partial payment of the purchase price. His argument is that, if he was entitled

3. INTEREST: non-
allowable in-
terest.

to an allowance of such partial payment as a credit in the account, he was equally entitled to interest thereon. In casting the account between them, the trial court allowed the item of $2,250 partial payment, but allowed no interest thereon. Likewise, the defendants, in stating their account, had allowed such item, but without interest thereon. Interest was allowed to the defendants on the deferred payment. Plaintiff argues that he was equally entitled to interest upon his payment. The point is not well taken. It is because the defendants were entitled to interest that the plaintiff was not. The plaintiff's partial payment to the defendants was due when it was made. The balance of the purchase price became due on June 3d. Such balance, therefore, properly drew interest. The partial payment of the purchase price by plaintiff did not create an indebtedness owed to him by the defendants. It simply extinguished *pro tanto* his indebtedness to the defendants. The payment stopped the accrual of interest against him. Surely, the payment of a debt in whole or in part does not create an obligation on the part of a creditor to pay interest to the debtor upon such payment. The judgment entered below is affirmed.—*Affirmed.*

STEVENS, C. J., ARTHUR and FAVILLE, JJ., concur.